UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Thornton K. Lillie,

    Plaintiff,

v.                                                    Civil Action No. 5:10-CV-298

Michael J. Astrue,
Commissioner of Social Security,

    Defendant.

## REPORT AND RECOMMENDATION
(Docs. 8, 10)

      Plaintiff Thornton Lillie brings this action under 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Pending before the Court are Lillie's motion seeking an order reversing the Commissioner's decision (Doc. 8), and the Commissioner's motion seeking an order affirming the same (Doc. 10).

      For the reasons stated below, I recommend granting the Commissioner's motion to affirm (Doc. 10), and denying Lillie's motion to reverse (Doc. 8).

## Background

      Lillie was born on December 25, 1947, and thus was fifty-four years old on the alleged disability onset date of January 1, 2002. (Administrative Record ("AR") 70, 72, 137, 140.) He completed high school and attended one year of college, and has worked

as a consultant and manager in the optics industry for almost twenty years.  (AR 30, 35, 178, 185.)  In 1999, Lillie claims to have suffered a heart attack and to have had difficulty returning to work because "his mind did not allow him to perform his usual tasks."  (AR 30.)  Nonetheless, he did return to work after the claimed heart attack, earning $33,993.25 for four quarters of work in the year 1999.  (AR 36.)  Lillie alleges that, after his 1999 heart attack, he has had "repeated mild strokes" (*id.*), which have "severely impaired his memory" (AR 31; *see also* AR 38).  He further claims to suffer from atrial fibrillation[1], depression, degenerative disc disease with peripheral neuropathy[2] in the legs and feet, difficulty concentrating, poor sleep, low energy, and suicidal ideation.  (AR 31-32.)  Additionally, Lillie reports having visual and audio hallucinations, including seeing ghosts and UFOs.  (AR 32, 62.)

On September 26, 2007, Lillie applied for disability insurance benefits, alleging that he became unable to work on June 30, 1999 as a result of his "[s]pinal damage, neuropathy in feet, dizziness, heart attack, stroke, [and] severe memory loss."  (AR 140-41, 177.)  He further alleged that he experienced chemical sensitivities preventing him from being around any type of alcohol-based chemicals; his dizziness caused him to be unsteady on his feet; he could not stand or sit for extended periods; and he had numbness and burning in his back and neck.  (AR 177.)  Lillie's disability application was denied initially and upon reconsideration, and he timely requested an administrative hearing,

---

[1] In "atrial fibrillation," "the normal rhythmic contractions of the [heart] are replaced by rapid irregular twitchings of the muscular wall."  STEDMAN'S MEDICAL DICTIONARY 722-23 (28th ed. 2006).

[2] "Neuropathy" is "[a] classic term for any disorder affecting any segment of the nervous system."  STEDMAN'S MEDICAL DICTIONARY 1313 (28th ed. 2006).

which occurred on June 7, 2010.  (AR 25-71, 72-79, 83-91.)

Lillie appeared and testified at the administrative hearing, and was represented by counsel.  (AR 25-71.)  Additionally, Lillie's wife, Wendy Lillie, and Vocational Expert ("VE") Ralph Richardson testified.  (AR 56-70.)  At the conclusion of the hearing, Lillie amended his alleged disability onset date to January 1, 2002.  (AR 70.)  On June 29, 2010, Administrative Law Judge ("ALJ") Debra Boudreau issued a decision finding that Lillie was not disabled under the Social Security Act.  (AR 12-19.)  Thereafter, the Decision Review Board selected Lillie's claim for review, but failed to conduct its review within the prescribed period, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1-3.)  Having exhausted his administrative remedies, Lillie filed the Complaint in the instant action on December 6, 2010.  (*See* Doc. 1.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if the impairment meets or equals a listed

impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

Employing this five-step analysis, ALJ Boudreau first determined that Lillie had not engaged in substantial gainful activity during the period from the alleged onset date of January 1, 2002 through the date last insured of March 31, 2006. (AR 14.) At step two, the ALJ found that Lillie had two severe impairments: coronary artery disease and degenerative disc disease. (AR 15.) Conversely, the ALJ found that Lillie's depression did not rise to the level of a "medically determinable impairment." (*Id.*) At step three, the ALJ found that Lillie did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (AR 15-16.)

4

Next, the ALJ determined that Lillie had the RFC to perform the full range of "light work,"[3] with the following limitations: "the claimant could occasionally lift or carry up to twenty pounds, frequently lift or carry up to ten pounds, stand and/or walk for a total of six hours in an eight-hour work day with normal breaks, . . . sit with normal breaks for a total of about six hours in an eight-hour work day . . . , and . . . occasionally climb, balance, stoop, kneel, crouch or crawl."  (AR 16.)  At step four, relying on the VE's testimony, the ALJ determined that Lillie was capable of performing his past relevant work as an optics manager, a consultant, and a supervisor, given that each of these jobs was at the sedentary or light exertional level and did not exceed Lillie's RFC during the alleged disability period.  (AR 19.)  Without making a step-five determination regarding whether Lillie could perform "any other work,"[4] the ALJ concluded that Lillie had not been under a disability, as defined in the Social Security Act, from the amended alleged onset date of January 1, 2002 through March 31, 2006, the date last insured.  (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

[3] As defined in the applicable regulation, "light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(a). The regulation further states: "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities."  *Id.*

[4] Lillie does not dispute either the ALJ's step-four determination or the ALJ's failure to make findings under step five.

5

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is

6

intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

### I.  ALJ's Failure to Discuss Dr. Tolbert's Opinion

On November 12, 2009, Kathryn Tolbert, Ph.D. interviewed and consulted with Lillie to "assess his current cognitive and emotional status following a brief psychotic episode without hospitalization." (AR 710.) In her "Report of Evaluation," Dr. Tolbert stated that testing revealed a "persistent tremor" and "real perceptual motor difficulties consistent with brain damage in an adult with normal intelligence." (AR 711.) Dr. Tolbert further stated that Lillie's test performance demonstrated both "very high verbal intelligence" and "very significant disabilities in the visual perception sphere." (AR 712.) Noting that Lillie also reported "significant pain" in his knees, ankles, and back; and suffered from "moderate depression" related to a loss of function and inability to work, Dr. Tolbert concluded:

> Lillie is an extremely intelligent man whose heart attack began a process of disability, which has primarily affected his visual motor processing and output. As a result of this disability[,] he has been unable to continue highly technical work, and is unable to remember the technical skills and information he once possessed . . . .

(AR 713.) Dr. Tolbert recommended a "thorough neurological exam" and vocational rehabilitation to address Lillie's cognitive issues, and continuation of therapy and medication to treat his depression and psychotic episodes. (AR 714.)

Lillie argues that the ALJ erred by "disregard[ing]" Dr. Tolbert's opinion, in violation of the treating physician rule. (Doc. 8-1 at 8.) That rule requires that "extra weight" be afforded to the expert opinion of a treating physician. *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983). Lillie has failed to demonstrate that the ALJ was required to give extra weight to the opinion, however, because he has not shown (or even argued) that the treating physician rule applies. The rule is employed only where the opinion of a "treating source" is at issue, 20 C.F.R. § 404.1527(d)(2), because "the continuity of treatment [that a treating physician] provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Mongeur v. Heckler*, 722 F.2d at 1039 n.2. A "treating source" is defined in the regulations as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, *an ongoing treatment relationship* with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source *with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)*.

20 C.F.R. § 404.1502 (emphases added). In accord with this regulation, in *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988), the Second Circuit defined a "treating physician" as follows: "[a] claimant's . . . own physician . . . or psychologist . . . who has provided the [claimant] with medical treatment or evaluation and who has or had *an ongoing treatment and physician-patient relationship* with the individual." (Emphasis added.) In subsequent decisions, the Circuit has specified that treating sources who see a patient

8

only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians. *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also Mongeur v. Heckler*, 722 F.2d at 1039 n.2. Here, there is no evidence that Dr. Tolbert provided treatment for or evaluation of Lillie on any occasion other than on November 12, 2009. This one consultation does not amount to an "ongoing treatment relationship" between Dr. Tolbert and Lillie, and thus the treating physician rule does not apply.

Even though Dr. Tolbert was not a "treating physician," she was a psychologist who consulted with and administered tests to Lillie, and she prepared a detailed report regarding such consultation and testing. (AR 710-14.) Thus, the ALJ should have explained her implicit decision to afford minimal weight to Dr. Tolbert's opinion. Nonetheless, I find that the ALJ's failure to mention the opinion amounts to harmless error because even if the ALJ had considered the opinion, it would not have changed her ultimate disability decision. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration").

There are two weaknesses in Dr. Tolbert's opinion which support the ALJ's decision to afford little weight thereto. First, as noted above, Dr. Tolbert consulted with Lillie in November 2009, over three years after the date last insured. The existence of a disability may be proven by a retrospective physician's opinion, but "such an opinion must refer clearly to the relevant period of disability and not simply express an opinion as

9

to the claimant's current status." *Vitale v. Apfel*, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999) (citing *Jones v. Sullivan*, 949 F.2d 57, 59-60 (2d Cir. 1991)). Nothing in Dr. Tolbert's opinion refers to Lillie's condition and impairments during the alleged period of disability, and there is no evidence that the testing performed by Dr. Tolbert (including the Beery Visual Motor Integration and Visual Perception Test; the Wechsler Adult Intelligence Scale – III; the Depression, Anxiety, Stress Scale; and the Minnesota Multiphasic Personality Inventory) related back to that period. Rather, the opinion specifically states that the purpose of the consultation and testing was to assess Lillie's "*current* cognitive and emotional status." (AR 710 (emphasis added).) Although the opinion references a 1999 heart attack, psychotic episode, and "possible stroke" (*see* AR 710, 713), it does not say anything about Lillie's condition and functional abilities during the alleged disability period of January 2002 through March 2006. Therefore, remand is not warranted on the basis of Dr. Tolbert's opinion. *See Toribio v. Barnhart*, No. 02 Civ. 4929(GEL), 2003 WL 21415329, at *4 (S.D.N.Y. June 18, 2003) (retrospective medical opinion from examining physician who did not examine plaintiff until after the relevant period did not warrant remand, as "the evidence is unlikely to have affected the outcome").

Second, other substantial evidence – referenced in the ALJ's decision – refutes Dr. Tolbert's opinion. *See Mongeur v. Heckler*, 722 F.2d at 1039 ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence . . . .") (citation omitted). Specifically, testing during the alleged disability period was unremarkable with respect to Lillie's heart issues. (AR 18 (citing AR 296).)

10

Moreover, in March 2004, treating cardiologist Dr. Robert Burke stated that Lillie's cardiac symptoms "seem[ed] to be reasonably well[-]controlled" with medication. (AR 313.) Two years later, in March 2006, treating primary care physician Dr. Oliver Herfort stated that Lillie had been "doing well over the last 12 months," was "enjoy[ing] life," and "[did] not have any specific complaints." (AR 629.) Further, as correctly recognized by the ALJ, the record demonstrates that the "strokes" which Lillie claims affected his ability to work during the alleged disability period occurred after March 31, 2006, the date last insured. (AR 18; *see, e.g.,* AR 331-45, 524-30, 721.) Lillie's claim that a January 29, 2010 MRI (discussed in more detail below) "indicates that [he] had suffered from numerous strokes over the years" (Doc. 8-1 at 3), *including during the alleged disability period*, is unsupported. Finally, many of the activities that Lillie reported being able to do during the relevant period – including walking his dog up a steep hill (AR 278), moving his daughter into her new store (AR 274), standing for two hours to sing in a choir (AR 600), and using a chainsaw in the woods (AR 303) – are not consistent with Dr. Tolbert's opinion that Lillie had a "severe loss of function" (AR 714). (*See* AR 17.)

## II.    Evidence Not Considered by ALJ

Lillie contends that the ALJ erred in failing to consider (a) the testimony of his wife, (b) the January 2010 MRI of his brain, and (c) "the effect of persistent atrial fibrillation on strokes and organic brain disease." (Doc. 8-1 at 9.) In general, an ALJ is not required to discuss every piece of evidence, particularly where the court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that [the ALJ's] determination was supported by substantial evidence." *Berry v.*

11

*Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982). The Second Circuit explained: "When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur v. Heckler*, 722 F.2d at 1040.

Here, the ALJ stated that she "careful[ly] consider[ed] . . . the evidence" (AR 17), which would have included the 2010 MRI and the testimony of Lillie's wife, Wendy Lillie. Moreover, with respect to Wendy Lillie's testimony (*see* AR 57-63), the Second Circuit does not require ALJs to discuss lay witness testimony, unless it is "critical," "uncontradicted[,]" and "generally consistent with the medical diagnoses[.]" *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988). Wendy Lillie's testimony is none of these things. Moreover, the testimony largely duplicates Lillie's own self-reporting of his symptoms. For example, both Lillie and his wife stated that Lillie had felt depressed (AR 47, 62), had difficulty following directions (AR 60, 192), had suffered back pain (AR 40, 56, 58, 226), was unable to kneel (AR 53, 59, 228), had difficulty walking (41, 43, 59, 232), and had seen ghosts (AR 48, 62). The ALJ appropriately acknowledged Lillie's self-reporting of these symptoms in her decision (*see* AR 16-17), and thus was not required to also explicitly describe and acknowledge Lillie's wife's testimony about them.

With respect to the January 2010 MRI, its relevance is negligible, given that: (a) it was taken almost four years after the date last insured; and (b) its meaning is unclear, providing no insight into Lillie's functionality or ability to work without the interpretive

12

assistance of a qualified medical professional. Specifically, the MRI states in the "Impression" section:

> 1. No evidence for acute infarct or hemorrhage.
> 2. Scattered bilateral subcortical and deep white matter hyperintensities most likely representing foci of chronic ischemic and/or degenerative change related to small vessel disease.
> Localized subcortical T2 hyperintensity consistent with subacute or chronic infarct involving a medial gyrus of the precentral region of the left frontal lobe.

(AR 721.) Even assuming, as Lillie contends, that this specialized, medical language translates in layman's terms to an assessment that Lillie "suffered from numerous strokes over the years" (Doc. 8-1 at 3), the MRI report does not indicate how these alleged strokes limited Lillie at any time, and particularly how they limited him during the alleged disability period. And it is noteworthy that, at least with respect to the July 2006 stroke, it is repeatedly described as "mild" in the medical record. (*See* AR 524, 528, 529.) For these reasons, the ALJ was not required to explicitly consider the 2010 MRI.

Finally, regarding Lillie's atrial fibrillation and strokes, the ALJ recognized Lillie's "history of atrial fibrillation," but properly noted that it had been "controlled with Coumadin" during the relevant period. (AR 18 (citing AR 313).) The ALJ also noted that Lillie had had "some transient ischemic attack symptoms since the date of his alleged onset of disability," but correctly stated, as noted above, that the record reflected that these symptoms had occurred after the date last insured. (AR 18; *see* AR 331-45, 524-30, 721.) Moreover, Lillie has failed to demonstrate that his atrial fibrillation limited him during the relevant period to an extent that exceeded the limitations included in the ALJ's RFC assessment.

## III.  Application of Listing 12.02

Lillie contends that his impairments met or medically equaled Listing 12.02 of the Listing of Impairments.[5]  For a claimant to qualify for benefits by showing that his impairment matches a listing, the impairment "must meet *all* of the specified medical criteria" for the specified listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).  For a claimant to qualify for benefits by showing that his unlisted impairment or combination of impairments is "equivalent" to a listed impairment, the claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.* at 531 (emphasis in original).  The Social Security Administration has explained that a determination as to whether a claimant's impairment or combination of impairments are medically the equivalent of a listed impairment "must be based on *medical evidence* demonstrated by medically accepted clinical and laboratory diagnostic techniques, including consideration of a *medical judgment* about medical equivalence furnished by one or more physicians designated by the Secretary."  SSR 86-8, 1986 WL 68636, at *4 (1986), *superseded on other grounds* by SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991) (emphasis added).

"Listing 12.02 pertains to organic mental disorders and requires a history and physical examination or laboratory tests demonstrating the presence of a specific organic factor etiologically related to the abnormal state and loss of previously acquired functional abilities." *Concepcion v. Astrue*, No. 3:09cv01376(SRU)(WIG), 2010 WL

---

[5] Lillie obscurely asserts: "The legal basis for disability to cognitive function based on the Plaintiff's issues of ischemic heart disease and stroke is found at Listing 12.02 . . . ."  (Doc. 8-1 at 7.)

14

2723184, at *5 (D. Conn. July 8, 2010) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02).  In order for Lillie's impairment or combination of impairments to meet or medically equal Listing 12.02, Lillie would have had to demonstrate that either "the requirements in both [12.02]A and [12.02]B are satisfied, or . . . the requirements in [12.02]C are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.  Lillie has not pointed to evidence in the record which demonstrates – during the alleged disability period – the "medically documented persistence" of any of the limitations required to meet Listing 12.02A, including for example, disorientation to time and place, change in personality, disturbance in mood, or loss of measured intellectual ability of at least 15 I.Q. points.  *Id.* at § 12.02A(1), (4), (5), (7).  Although there was testimony from Lillie and his wife about certain of these limitations, that testimony was vague as to time, and more importantly, lay testimony is not the equivalent of medical evidence, which is required to meet a listing.  Lillie has also failed to identify evidence meeting the requirements of Listing 12.02C, which requires, in part, a "[m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support."  *Id.* at § 12.02C.  Accordingly, the ALJ did not err in failing to analyze Lillie's impairments under Listing 12.02.

**IV.   ALJ's Consideration of Lillie's Allegations of Pain**

Lillie argues that the ALJ erred by not considering "the effect and magnitude of pain alone on [Lillie's] ability to work."  (Doc. 8-1 at 9.)  But the ALJ explicitly

15

acknowledged Lillie's allegations of pain in her decision, stating for example that Lillie "reported pain in his back, knees, ankles, elbows[,] and neck as well as sciatica that runs down both of his legs." (AR 17.) The ALJ continued: "[Lillie] takes Tramadol for pain. He self-assessed his pain level with Tramadol on an average day at a '5' on a pain scale of '1' to '10,' with '10' being the most severe." (*Id.*) The ALJ further noted that "[t]he pain level in [Lillie's] knees has worsened, but the back pain has stayed the same in the last five years." (*Id.*) Despite these allegations, the ALJ concluded that "the record . . . evidence establishes that [Lillie] has substantially greater functional capabilities" than alleged. (*Id.*)

"In consideration of a claimant's subjective accounts of how her level of pain affects her ability to work, an ALJ will evaluate the claimant's statements in relation to the objective medical evidence." *Armstrong v. Comm'r of Soc. Sec.*, No. 1:06-CV-1049, 2009 WL 2883046, *4 (N.D.N.Y. Sep. 4, 2009). If the claimant's statements about pain are not substantiated by the objective medical evidence, the ALJ must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms. SSR 96-7p, 1996 WL 374186, *4 (July 2, 1996). The ALJ must then make a finding on the credibility of the claimant's statements about symptoms and their functional effects. *Id.* "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.*

Here, the ALJ explicitly considered the appropriate credibility factors in her decision, and gave specific reasons to support her credibility determination with respect

16

to Lillie's allegations of pain. (AR 16-18.) For example, the ALJ noted that, despite Lillie's allegations of disabling pain, testing during the alleged disability period was unremarkable, and examinations consistently showed normal gait and strength. (AR 17 (citing AR 596); *see also* AR 549.) The ALJ further noted, citing to the relevant evidence, that Lillie's reported daily activities included activities such as preparing meals, picking up his grandchildren from school, walking his dog up a steep hill, mowing the lawn, doing light housecleaning, washing the dishes, doing yard work, going grocery shopping, reading, helping his daughter move into a new store, standing for two hours to sing in a choir, and using a chainsaw in the woods all day. (*Id.* (citing AR 187-94, 274, 278, 303, 600).) Other evidence demonstrates that Lillie was generally feeling well during the alleged disability period. For example, a May 2005 treatment note states that Lillie "has been out on his property walking without any real limitations." (AR 306.) And an October 2005 treatment note states that Lillie "has been feeling generally well" and in fact, "feels the best he has felt in many years." (AR 303.) A March 2006 treatment note records that Lillie "has been doing well over the last 12 months," and "says he enjoys life" and "does not have any specific complaints." (AR 629.) It is difficult to reconcile these activities and recordings with Lillie's statements to the ALJ and the Social Security Administration regarding the debilitating nature of his pain. (*See, e.g.,* AR 196 (Pain Report where Lillie claimed to have "chronic" pain in his lower back, buttock, and legs which generally lasted "all day," and "crushing pain" in those areas which generally lasted "days").)

Overall, the record reflects that, during the alleged disability period, although Lillie experienced pain, his symptoms were basically controlled with medication; he did not require intensive treatment, counseling, or hospitalization; and he was able to engage in many daily activities. The Second Circuit has explained that "disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983); *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("The mere fact that working may cause pain or discomfort does not mandate a finding of disability."). The record here does not demonstrate that Lillie's impairments precluded any substantial gainful employment during the alleged disability period.

## V.     Lillie's Obesity

Finally, Lillie makes a passing argument that the ALJ erred in failing to consider "the effect of [Lillie's] morbid obesity on his back pain and . . . circulatory problems." (Doc. 8-1 at 10.) Lillie does not cite any evidence in support of this argument, and although there is reference to "obesity" in the record (*see, e.g.,* AR 266, 301, 303, 305, 307, 309, 311, 313, 318), I am unable to find any reference to "morbid" obesity. In his Disability Report, Lillie did not list obesity as one of his "illnesses, injuries, or conditions that limit[s] [his] ability to work." (AR 177.) He also failed to mention his obesity at the administrative hearing. More importantly, Lillie fails to point to any evidence demonstrating that his obesity caused him pain or other discomfort, exacerbated his pain caused by other conditions, or limited his ability to function. A review of the record

reveals that none of Lillie's treating or consulting physicians limited him due to obesity. To the extent that Lillie's obesity may have contributed to the severity of his pain, the ALJ properly considered Lillie's complaints of pain, as discussed above. For these reasons, I find no error in the ALJ's failure to reference Lillie's obesity in her decision. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 & n.5 (3d Cir. 2005) (declining to remand due to ALJ's failure to consider plaintiff's obesity, when plaintiff "never mentioned obesity as a condition that contributed to her inability to work, even when asked directly by the ALJ to describe her impairments" and no medical evidence indicated obesity contributed to any limitation); *Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) (rejecting claimant's obesity argument, and finding that ALJ's failure to elaborate on the issue of obesity "likely stems from the fact that [the claimant] failed to present evidence of any functional limitations resulting specifically from her obesity); *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (rejecting claimant's argument that ALJ erred in failing to consider his obesity, explaining that, "[a]lthough his treating doctors noted that [the claimant] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions"); *Drew v. Astrue*, No. 09-363-B-W, 2010 WL 1946335, at *5 (D. Me. May 12, 2010).

## Conclusion

For the above reasons, I recommend that the Commissioner's motion to affirm (Doc. 10) be GRANTED, and that Lillie's motion to reverse (Doc. 8) be DENIED.

Dated at Burlington, in the District of Vermont, this 16th day of August, 2011.


*/s/John M. Conroy*
John M. Conroy
United States Magistrate Judge



Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c).  Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).